# Exhibit C



**KELLEY A. SWEENEY**
**CUYAHOGA COUNTY CLERK OF COURTS**
**1200 Ontario Street**
**Cleveland, Ohio 44113**

## Court of Common Pleas

**MOTION Electronically Filed:**
**January 22, 2015 12:34**

By: ROBERT E. DEROSE 0055214

Confirmation Nbr. 339394

STEVEN SCHMITZ   ET AL                                    CV 14 834486

        vrs.
                                                          **Judge:**
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
ET AL

                                                  DEENA R. CALABRESE

                        **Pages Filed:**   54

IN THE COURT OF COMMON PLEAS CUYAHOGA COUNTY, OHIO

STEVEN SCHMITZ and    :
YVETTE SCHMITZ,     :
           :
   Plaintiffs,     :  Case No. CV 14 834436
           :
v.          :  Hon. Deena R. Calabrese
           :  Magistrate Judge Monica Klein
           :
NATIONAL COLLEGIATE ATHLETIC :  Plaintiffs' Motion for Leave to
ASSOCIATION, AND     :  File Amended Complaint
UNIVERSITY OF NOTRE DAME,  :  Pursuant to Rule 15(A)
           :
   Defendants.    :
           :

**PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT
PURSUANT TO RULE 15(A)**

The Plaintiffs, Steven and Yvette Schmitz, by and through undersigned counsel, and

pursuant to Rule 15(A) of the Ohio Rules of Civil Procedure, respectfully move this Court for an

Order granting Leave to File an Amended Complaint against Defendants National Collegiate

Athletic Association ("NCAA") and University of Notre Dame ("Notre Dame"), and state as

follows:

1.  Plaintiffs' Complaint was filed in the instant Court on October 20, 2014.[1]

2.  Defendant Notre Dame was served with a Summons and copy of Plaintiffs'

Complaint on or about October 23, 2014.

3.  Defendant NCAA was served with a Summons and copy of Plaintiffs' Complaint

on or about October 31, 2014.

4.  On November 18, 2014, the parties filed a Joint Motion to Extend Time for All

Defendants to Respond to the Complaint and to Set Briefing Schedule.

_____

[1] Plaintiffs first filed their lawsuit against the Defendants on June 26, 2014 in the Federal District
Court for the Northern District of Ohio, Case No. 14-cv-01399. Plaintiffs dismissed that
Complaint voluntarily without prejudice and re-filed the case in this Court

5.      On November 24, 2014, this Court granted the Joint Motion to Extend Time for All Defendants to Respond to the Complaint and to Set Briefing Schedule, providing, in part, that: Defendants had until December 22, 2014 to respond to Plaintiffs' Complaint; Responses are due on or by January 22, 2015; and Replies, if any, are due on or by February 2, 2015.

6.      On December 22, 2014, Defendants Notre Dame and NCAA both filed Motions to Dismiss Plaintiffs' Claims.

7.      In its Motion to Dismiss, Defendant Notre Dame alternatively requested a more definite Statement of Facts as to Count V (express breach of contract) of the Complaint under Ohio Rule of Civil Procedure 12(E).

8.      Defendant NCAA also asserted that Plaintiffs' breach of contract claims should be dismissed because Plaintiffs did not allege the existence to any express written contract.

9.      Accordingly, while simultaneously filing an Opposition to Defendants' Motions to Dismiss, Plaintiffs also seek leave to file an Amended Complaint, in order to remedy any alleged procedural defects Defendants complained of regarding the express contract claims of Plaintiffs' Complaint.

10.      Both Defendants misconstrue the Complaint and argue that Steve Schmitz' injuries, which were latent and have now developed, were known and ascertainable while Steve Schmitz played football at Notre Dame.  That is not what the Complaint says; however, to be certain that both the Defendants and the Court clearly understand the facts and claims alleged, Plaintiffs seek leave to amend.

11.      Additionally, although Plaintiffs do not believe they are required to do so, for the reasons set forth more fully in Plaintiffs' Opposition to Defendants' Motions to Dismiss, Plaintiffs also seek leave to amend to insert additional facts regarding the timing and

- 2-

circumstances of Plaintiff Steve Schmitz' diagnosis with Chronic Traumatic Encephalopathy (or

"CTE"), the signature disease of chronic head impacts in football. Again, the amendment's

purpose is to make certain that Defendants and the Court clearly understand the facts alleged.

12.     Finally, Plaintiffs further seek leave to file an Amended Complaint to add a claim

for Constructive Fraud against both Defendants NCAA and Notre Dame.

WHEREFORE, for the foregoing reasons, and those set forth more fully in the

accompanying Memorandum of Law, Plaintiffs hereby respectfully request that this Motion be

granted and that this Honorable Court approve the attached proposed Order.

January 22, 2015                    **Respectfully Submitted,**

**BARKAN MEIZLISH HANDELMAN
GOODIN DEROSE WENTZ, LLP**

*/s/ Robert E. DeRose*
Robert E. DeRose (OH Bar No. 0055214)
Neal J. Barkan (OH Bar No. 000020450)
250 E. Broad St., 10th Floor
Columbus, Ohio 43215
Phone: 614-221-4221
Facsimile No.: 614-744-2300
Email: bderose@barkanmeizlish.com
        nbarkan@barkanmeizlish.com

And

David D. Langfitt (Pro Hac Vice Anticipated)
Melanie J. Garner (Pro Hac Vice Anticipated)
**LOCKS LAW FIRM**
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 893-3423
Fax: (215) 893-3444
Email: dlangfitt@lockslaw.com
        mgarner@lockslaw.com
And

- 3-

Richard S. Lewis (Pro Hac Vice Anticipated)
**HAUSFELD LLP**
1700 K Street, N.W.
NW Suite 650
Washington, DC 20006
Ph: 202-540-7151
Fax: 202.540.7201
Email: rlewis@hausfeldllp.com
**ATTORNEYS FOR PLAINTIFFS STEVEN
AND YVETTE SCHMITZ**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on January 22, 2015

using the CM/ECF filing system which I understand will send a notice of electronic filing to all

parties of record through the Court's system, and served via regular mail on the following

parties:

Matthew A. Kairis
Aaron M. Healey
**JONES DAY**
325 John H. McConnell Blvd., Suite 600
Columbus, OH 43215-2673

Steven A. Friedman
Frederick R. Nance
Sean L. McGrane
**SQUIRE PATTON BOGGS (US) LLP**
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114

Respectfully submitted,

*/s/ Robert E. DeRose*
Robert E. DeRose, Esquire

- 4-

IN THE COURT OF COMMON PLEAS CUYAHOGA COUNTY, OHIO

STEVEN SCHMITZ and                          :
YVETTE SCHMITZ,                             :
                                            :
            Plaintiffs,                     :      Case No. CV 14 834436
                                            :
v.                                          :      Hon. Deena R. Calabrese
                                            :      Magistrate Judge Monica Klein
                                            :
NATIONAL COLLEGIATE ATHLETIC                :      Memorandum of Law in Support of
ASSOCIATION, AND                            :      Plaintiffs' Motion for Leave to
UNIVERSITY OF NOTRE DAME,                   :      File Amended Complaint
                                            :      Pursuant to Rule 15(A)
            Defendants.                     :
                                            :

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT
PURSUANT TO RULE 15(A)**

The Plaintiffs, Steven and Yvette Schmitz, by and through undersigned counsel, and

pursuant to Rule 15(A) of the Ohio Rules of Civil Procedure, respectfully move this Court for an

Order granting Leave to File Amended Complaint against Defendants National Collegiate

Athletic Association ("NCAA") and University of Notre Dame ("Notre Dame"), and hereby

submit this Memorandum of Law in Support of their Motion.  A copy of the proposed Amended

Complaint is attached hereto as "Exhibit A."

## I.      **BACKGROUND AND STATEMENT OF FACTS**

This case arises from the NCAA's and Notre Dame's (collectively referred to as "Defendants")

reckless disregard for the safety of amateur collegiate football players generally and specifically

for the safety of Plaintiff Steve Schmitz, a former running back and receiver for the Notre Dame

football team between 1974 and 1978.  Complaint at ¶ 1.  Notre Dame, its football coaches,

athletic directors, and trainers, and the NCAA failed to notify, educate, and protect the plaintiff

Steve Schmitz (and others) regarding the debilitating long-term dangers of sub-concussive and

concussive impacts that result every day from amateur athletic competition in the form of

football at the collegiate level. *Id.* at ¶2. As a direct result of Defendants' tortious actions, Plaintiff Steve Schmitz now suffers neurological and cognitive damage that was diagnosed as Chronic Traumatic Encephalopathy (or "CTE"), the signature disease of concussive and sub-concussive head impacts in football.

On October 20, 2014, Plaintiffs Steve and Yvette Schmitz filed a Complaint in this Court against Defendants NCAA and Notre Dame. Plaintiffs' Complaint included the following claims: Count I – Negligence; Count II – Fraudulent Concealment; Count III – Breach of Express Contract vs. NCAA; Count IV – Breach of Implied Contract vs. NCAA; Count V – Breach of Express Contract vs. Notre Dame; and Count VI – Loss of Consortium.

Defendant Notre Dame was served with a Summons and copy of Plaintiffs' Complaint on or about October 23, 2014, and Defendant NCAA was served with a Summons and copy of Plaintiffs' Complaint on or about October 31, 2014. On November 18, 2014, the parties filed a Joint Motion to Extend Time for All Defendants to Respond to the Complaint and to Set a Briefing Schedule. On November 24, 2014, this Court granted the Joint Motion to Extend Time for All Defendants to Respond to the Complaint and to Set Briefing Schedule. In accordance with that briefing schedule, Defendants Notre Dame and NCAA both filed Motions to Dismiss Plaintiffs' Claims December 22, 2014.

In its Motion to Dismiss Plaintiffs' Complaint, Defendant Notre Dame alternatively requests a more definite statement of facts as to Count V (express breach of contract) of the Complaint under Ohio Rule of Civil Procedure 12(E). *See* Defendant Notre Dame's Memorandum at 19-21. More specifically, Defendant Notre Dame complains that Plaintiff Steve Schmitz did not attach a copy of the contract or explain the reasons why he did not attach the

-2-

contract to the Complaint as required by Ohio Rule of Civil Procedure 10(D)(1).  *See* Defendant Notre Dame's Memorandum at 20.

Defendant NCAA asserts that the Count III of Plaintiffs' Complaint regarding Steve Schmitz's contract claims should be dismissed because the "form" or applicable contract was not attached as required by Ohio Rule of Civil Procedure 10(D)(1).  *See* Defendant NCAA's Memorandum at 16.  Alternatively, Defendant NCAA suggests that "[a]t a minimum . . . this procedural deficiency requires Plaintiff to file a more definite statement of his contract claims" under Ohio Rule of Civil Procedure 12(E).  *See* Defendant NCAA's Memorandum at 16, n. 4.

Both Defendants misconstrue the Complaint and argue that Steve Schmitz recognized the injuries at issue at the time he played football in the late 1970's, even though that is not what the Complaint says.  Notre Dame Memorandum at 8-9; NCAA Memorandum at 7-8.

Defendant NCAA claims that there is no such thing as a claim for Fraudulent Concealment.  NCAA Memorandum at 17-18.

Although Plaintiffs are simultaneously filing an Opposition to Defendants' Motions to Dismiss on today's date under the Briefing Schedule, Plaintiffs also seek leave to file an Amended Complaint in order to (a) remedy any alleged procedural issues Defendants complain of regarding the express contract claims of Plaintiffs' Complaint; (b) add facts regarding the timing and circumstances of Plaintiff Steve Schmitz' diagnosis;; (c) make certain that Defendants clearly understand that Steve Schmitz never knew or recognized that he sustained an injury while he played football at Notre Dame; (d) add a claim for constructive fraud, which is appropriate under the circumstance; (e) amend marginally the claim for fraudulent concealment; and (f) respond to Notre Dame's request in its Motion to Dismiss for a more definite statement regarding why the contracts were not attached to the Complaint.

-3-

## II.   **LEGAL ARGUMENT**

Pursuant to Rule 15(A) of the Ohio Rules of Civil Procedure, "[t]he court shall freely

grant leave to amend when justice so requires."  Ohio Civ. R. 15(A).  "[T]he decision of whether

to grant a motion for leave to amend under Civ. R. 15(A) is within the discretion of the trial

court."  *Hoover v. Sumlin*, 12 Ohio St. 3d 1, 6 (Ohio 1984).  Nevertheless, "the language of [Rule

15(A) favors a liberal amendment policy and a motion for leave to amend should be granted

absent a finding of bad faith, undue delay or undue prejudice to the opposing party."  *Id.*

(citations omitted).  In considering the purpose and intent of Rule 15(A), the Supreme Court has

stated as follows:

> **The spirit of the Civil Rules is the resolution of cases upon their
> merits, not upon pleading deficiencies**. Civ. R. 1(B) requires that the Civil Rules
> shall be applied "**to effect just results**."  Pleadings are simply an end to that
> objective.  The mandate of Civ. R. 15(A) as to amendments requiring leave of
> court, is that leave "shall be freely given when justice so requires."  Although the
> grant or denial of leave to amend a pleading is discretionary, **where it is possible
> that the plaintiff, by amended complaint, may set forth a claim upon which
> relief may be granted, and it is tendered timely and in good faith and no
> reason is apparent for denying leave, the denial of leave to file such an
> amended complaint is an abuse of discretion.**

*Peterson v. Teodosio*, 34 Ohio St. 2d 161, 175 (Ohio 1973) (emphasis added).

Here, Plaintiffs filed the Complaint on October 20, 2014 and promptly served it.  In their

first filings with the Court, Defendants sought to dismiss the Complaint. In Plaintiffs' view, the

Defendants misconstrue the Complaint to support a spurious statute of limitations argument;

therefore, Plaintiffs seek leave to amend to address these issues and other issues raised by

Defendants with respect to Plaintiffs' contract claims, as well as to include facts regarding the

timing and circumstances of Plaintiff Steve Schmitz' medical condition.  By seeking leave to

amend, it is clear that Plaintiffs are acting in good faith and without any undue delay.

-4-

Additionally, Defendants were already put on notice of Plaintiffs' claims at the time they received Plaintiffs' Complaint. For that reason, Defendants cannot claim any undue prejudice, especially where Defendants specifically seek a more definite statement with respect to the contract claims. To the extent Defendants are unclear about the timing, circumstances, and diagnosis surrounding Plaintiff Steve Schmitz' condition, the amendment should help.

Finally, Plaintiffs seek leave to amend to add a claim for constructive fraud against Defendants NCAA and Notre Dame. Defendants cannot claim bad faith, undue delay or prejudice with respect to the addition of a constructive fraud claim, either, because it is not significantly different from the fraudulent concealment claim, of which Defendants already had notice.

Where there is no bad faith, undue delay or undue prejudice to Defendants, Plaintiffs' Motion for Leave to File an Amended Complaint should be granted in the interests of justice. Doing so will allow Plaintiffs to address technical issues and will allow the parties to litigate the claims on their merits. *See Peterson v. Teodosio*, 34 Ohio St. 2d at 175; *McConnell v. Hunt Sports Enters.*, 132 Ohio App. 3d 657, 679 (1999) (holding that trial court did not abuse its discretion in granting the plaintiff's motion for leave to file a second amended complaint filed five weeks before trial because defendant was not prejudiced as a result and stating that "time alone is . . . insufficient . . . , and the primary consideration is whether there is actual prejudice to the opposing party"). *See also Point Rental Co. v. Posani*, 52 Ohio App. 2d 183, 185 (1976) (reversing trial court's dismissal of the plaintiff's complaint for failure to attach copy of contract pursuant to Ohio Civil Rule 10(D) and stating that the proper procedure would be for the trial court to grant a defendant's motion for more definite statement pursuant to Civil Rule 12(E) and

allow the plaintiff leave to amend to attach the contract or to state a valid reason for failing to attach the contract in response thereto).

III.　　**CONCLUSION**

For the foregoing reasons, Plaintiffs hereby respectfully request that their Motion for Leave to File an Amended Complaint Pursuant to Rule 15(A) be granted and that this Honorable Court approve the attached proposed Order.

Respectfully Submitted,

**BARKAN MEIZLISH HANDELMAN GOODIN DEROSE WENTZ, LLP**

*/s/ Robert E. DeRose*
Robert E. DeRose (OH Bar No. 0055214)
Neal J. Barkan (OH Bar No. 000020450)
250 E. Broad St., 10th Floor
Columbus, Ohio　43215
Phone: 614-221-4221
Facsimile No.: 614-744-2300
Email: bderose@barkanmeizlish.com
　　　　nbarkan@barkanmeizlish.com

And

David D. Langfitt (Pro Hac Vice Anticipated)
Melanie J. Garner (Pro Hac Vice Anticipated)
**LOCKS LAW FIRM**
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 893-3423
Fax: (215) 893-3444
Email: dlangfitt@lockslaw.com
　　　　mgarner@lockslaw.com

-6-

And

Richard S. Lewis (Pro Hac Vice Anticipated)
**HAUSFELD LLP**
1700 K Street, N.W.
NW Suite 650
Washington, DC 20006
Ph: 202-540-7151
Fax: 202.540.7201
Email: rlewis@hausfeldllp.com

**ATTORNEYS FOR PLAINTIFFS STEVEN
AND YVETTE SCHMITZ**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Motion for Leave to File Amended

Complaint Pursuant to Rule 15(A), Plaintiffs' Memorandum of Law in Support thereof, a

Proposed Copy of Plaintiffs' Amended Complaint and a proposed Order are being served on all

counsel of record this 22nd day of January, 2015, via the Court's electronic filing system and by

electronic mail and/or regular United States mail, postage prepaid.

*/s/ Robert E. DeRose*
Robert E. DeRose

*One of the Attorneys for Plaintiffs,*
*Steve and Yvette Schmitz*

-7-

# Exhibit A

IN THE COURT OF COMMON PLEAS CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| STEVEN SCHMITZ and<br>YVETTE SCHMITZ, | : | |
| | : | |
| Plaintiffs, | : | No. CV 14 834486 |
| | : | |
| v. | : | |
| | : | |
| NATIONAL COLLEGIATE ATHLETIC<br>ASSOCIATION, AND<br>UNIVERSITY OF NOTRE DAME, | : | |
| | : | |
| | : | JURY DEMAND ENDORSED HEREON |
| Defendants. | : | |
| | : | |

## FIRST AMENDED COMPLAINT

The Plaintiffs, STEVEN AND YVETTE SCHMITZ, by and through undersigned counsel, bring this Complaint against the Defendants, the National Collegiate Athletic Association ("NCAA") and the University of Notre Dame ("Notre Dame"), and allege, upon facts and information and belief as follows.

### Introduction

1.      This case arises from the NCAA's and Notre Dame's (collectively referred to as "Defendants") reckless disregard for the safety of amateur collegiate football players generally and specifically for the safety of Plaintiff Steve Schmitz, a former running back and receiver for the Notre Dame football team between 1974 and 1978.

2.      Notre Dame, its football coaches, athletic directors, and trainers, and the NCAA failed to notify, educate, and protect the plaintiff Steve Schmitz (and others) regarding the debilitating long-term dangers of concussions, concussion-related impacts, and sub-concussive impacts that result every day from amateur athletic competition in the form of football at the collegiate level.

-1-

3.     The pathological and debilitating effects of mild traumatic brain injuries (referenced herein as "MTBI") caused by concussive and sub-concussive impacts have afflicted, and currently afflict, former and present collegiate football players, including the Plaintiff Steve Schmitz, who is permanently disabled and suffers substantial symptoms of neuro-cognitive injuries, including symptoms of traumatic encephalopathy.  Those injuries were caused or substantially caused by the repetitive head impacts Steve Schmitz sustained as a four year football player at Notre Dame.

4.     The published medical literature, as detailed later in this Complaint, contains studies of athletes dating back as far as 1928 and demonstrates a scientifically-observed link between repetitive blows to the head and short-term and long-term neuro-cognitive problems.

5.     The earliest studies focused on boxers, but at least by 1933 and through the 1940s, 1950s, 1960s, 1970s, and 1980s, a substantial body of medical and scientific evidence had been developed specifically relating to brain injuries in the sport of football.

6.     Moreover, many NCAA member institutions, including Defendant Notre Dame, characterize themselves as institutions of higher learning on the leading edge of developing knowledge.  Many of the NCAA's institutions offer undergraduate and graduate courses in neuro-science and operate large medical research hospitals and facilities that include departments of neurology, neurosurgery, and psychiatry.

7.     The NCAA's access to and relationship with such member institutions places it in a unique position to understand the dangers of concussions and sub-concussive impacts and to use that information for the benefit of collegiate athletes, particularly football players.

8.     Defendant Notre Dame offers courses and an undergraduate degree in neuroscience, which placed and places Notre Dame in a unique vantage point to understand the

-2-

damages of concussions in college sports, particularly football, and to disseminate such information to those students most at risk for concussive and sub-concussive impacts in amateur football, particularly players on the Notre Dame football team.

9. Defendants, therefore, have been in a unique position to be cognizant of the body of scientific evidence and its compelling conclusions that college football players are at greater risk for chronic brain injury, illness, and disability both during their football careers and later in life. The Defendants also had and have the resources and power to implement measures to prevent or minimize the risk that Notre Dame football players specifically, and NCAA football players generally, will sustain debilitating long-term brain injuries.

10. Notwithstanding the body of known scientific evidence and the resources and power possessed by the Defendants, the Defendants orchestrated an approach to football practices and games that

(a) ignored the medical risks to Steve Schmitz and other Notre Dame football players;

(b) aggravated and enhanced the medical risks to Steve Schmitz and other football players;

(c) failed to educate Steve Schmitz and other Notre Dame football players of the link between concussive and sub-concussive impacts in amateur football and chronic neurological damage, illnesses, and decline; and

(d) failed to implement or enforce any system that would reasonably have mitigated, prevented, or addressed concussive and sub-concussive impacts suffered by Steve Schmitz.

Electronically Filed 01/22/2015 12:34 / MOTION / CV 14 834486 / Confirmation Nbr. 339394 / BATCH

11.     As a direct result of the Defendants' tortious actions, Plaintiff Steve Schmitz suffers from, among other things, neurological and cognitive damage that have resulted in full disability at age 58.

## Parties

### A. Plaintiffs

12.     Plaintiff Steve Schmitz is an individual who resides in Cleveland, Ohio.

13.     Plaintiff Yvette Schmitz is married to Steve Schmitz and lives in the same home.

14.     Steve Schmitz is a graduate of Defendant Notre Dame, where he played varsity football for four seasons.

15.     Before attending Notre Dame, Steve Schmitz was a student at St. Edward High School in Lakewood, Ohio and was an outstanding football player.

16.     While Steve Schmitz was playing high school football, representatives of the Defendant Notre Dame football program, including the Head Coach, visited him in Cleveland to convince him to attend Notre Dame and play football for the program.  In the spring of 1974, during his senior year of high school, Steve Schmitz signed a "letter of intent" in Cleveland, Ohio to attend Defendant Notre Dame and play college football for Notre Dame.  In exchange, Steve Schmitz received a scholarship and the right to attend the university.

17.     The scholarship was conditioned on his participation on the Notre Dame football team, and Plaintiff Steve Schmitz would forfeit his ability to attend Notre Dame on scholarship if he left or was cut from the football team.

18.     At no time during his participation on the Notre Dame football team was Plaintiff Steve Schmitz in a position to understand or appreciate the risks of concussive and sub-concussive impacts.  At no time did Plaintiff Steve Schmitz ever have the knowledge or authority

-4-

to impose and implement for the Notre Dame football team health-related measures, treatment, and protocols to prevent, minimize, and/or treat concussive and sub-concussive impacts.

19.     Soon after Steve Schmitz graduated from college, he stopped playing football and obtained employment in various companies in the Cleveland region of Ohio.  Currently, Steve Schmitz is 58 years old and is not employable.  He has been diagnosed with severe memory loss, cognitive decline, Alzheimer's, traumatic encephalopathy, and dementia, all of which have been caused, aggravated, and/or magnified by the repetitive concussive blows and/or sub-concussive blows to the head he suffered while playing running back and receiver on the Notre Dame college football team.

20.     More specifically, the first time that Plaintiffs Steve and Yvette Schmitz were informed by competent medical authority that Steve Schmitz had suffered a brain injury related to playing football was on December 31, 2012, when they received the diagnosis from the Cleveland Clinic that Steve Schmitz suffered from traumatic encephalopathy.

21.     Traumatic encephalopathy is Chronic Traumatic Encephalopathy (or "CTE"), the signature latent disease of chronic head impacts in football.

22.     Prior to that date, Steve Schmitz did not know and had no grounds to believe that he had suffered a latent injury caused by playing football.

### B. Defendants

23.     Defendant NCAA is an unincorporated association with its principal office located in Indianapolis, Indiana and with member institutions in every state.  The NCAA is the governing body of collegiate athletics and oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics.  More than 1,000 colleges are

-5-

members of the NCAA and submit to NCAA authority on that basis, including but not limited to the Defendant Notre Dame.

24.    In 2010, the NCAA entered into an exclusive television and media rights contract with CBS and Turner Broadcasting. Over the 14-year term contract, the NCAA is to receive $10.8 billion. Similarly, in 2011, the NCAA entered into a multi-media agreement with ESPN, which is to provide for payments totaling $500,000,000 over the life of the 14-year contract.

25.    In 2012, the NCAA's total revenues exceeded $838,000,000.

26.    Defendant Notre Dame University is a private not-for-profit university located in Notre Dame, Indiana, near South Bend. Its own mission statement describes Notre Dame as a "…Catholic academic community of higher learning…dedicated to the pursuit and sharing of truth for its own sake."

27.    Notre Dame is operated and controlled by a Board of Trustees, but ultimately by the Board of Fellows, a group of six Order of the Holy Cross religious members and six lay members who have final say over the operation of Notre Dame.

28.    As a member of the NCAA, and as a private institution of higher learning, Notre Dame had (and still has) co-extensive control over the implementation of NCAA rules and regulations, its own rules and regulations, and co-extensive responsibility to notify, educate, and protect the plaintiff Steve Schmitz, both before and after he played for the Notre Dame football team, regarding the debilitating short-term and long-term dangers of concussions, and concussive and sub-concussive impacts.

29.    On information and belief, Notre Dame generates from football alone $78 million in gross revenue and $46 million in profit every year, for which Notre Dame pays no taxes. According to Forbes Magazine, the Notre Dame football program is currently valued at $117 million.

-6-

According to Forbes, the Notre Dame football program is the second most valuable college football program in the world. The University of Texas is first.

30.     In 2013, NBC Sports Group announced a 10-year contract extension to televise Notre Dame football games, doubling the length of its previous agreement. NBC and Notre Dame said the extension would begin in 2016 and run through the 2025 season. The contract is worth $15 million annually for football.

31.     The President of Notre Dame, John Jenkins, controls all intercollegiate athletics at Notre Dame, and the Athletic Director reports directly to the President.

32.     On information and belief, the current Head Coach of the Notre Dame football program receives an annual salary of approximately $3,000,000, which is on information and belief is approximately six times the salary of the President (or any other academic officer) of Notre Dame.

## Jurisdiction And Venue

33.     This Court has jurisdiction pursuant to Section 2305.01 of the Ohio Revised Code. This Court also has subject matter jurisdiction over this case, because the plaintiffs are citizens of Ohio, and the Defendant NCAA is a citizen of the State of Ohio, because it has member institutions within this state. Moreover, Defendant Notre Dame conducted business activities with this state and county when it recruited Plaintiff Steve Schmitz to play football at Notre Dame. On information and belief, it continues to engage in similar activity.

34.     Venue is proper in this Court pursuant to Rule 3 (B) (3) and (7) of the Ohio Rules of Civil Procedure.

-7-

### Factual Allegations Common to All Counts

35.     Combined, the Defendants generate hundreds of millions of dollars in annual profits by organizing, sponsoring, and staging amateur football games with enrolled student-athletes, almost all of whom are between 18 and 22 years of age.

36.     Medical science, including world-renowned departments of medicine in NCAA member institutions, has known for many decades that repetitive and violent jarring of the head or impact to the head can cause sub-concussive and/or concussive impacts with a heightened risk of long term, chronic neuro-cognitive sequelae.  Many of the member institutions of the Defendant NCAA, including the Defendant Notre Dame, offer and have offered academic and/or professional programs in neuroscience, psychology and/or psychiatry for many years.

37.     The American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain.  TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue.  Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain.  Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

38.     The Defendants have known (or should have known) for many years that sub-concussive and concussive brain blows generally occur when the head either accelerates rapidly and then is stopped, or is rotated rapidly.  The results frequently include, among other things, confusion, disorientation, blurred vision, ringing in the ears, memory loss, nausea, and sometimes unconsciousness.

39.     The Defendants have known (or should have known) for many years that medical evidence has shown that symptoms of sub-concussive and/or concussive brain impacts can appear hours or days after the impact, indicating that the impacted party has not healed from the initial blow.

40.     The Defendants have known (or should have known) for many years that once a person suffers sub-concussive and/or concussive brain impacts , that person is up to four times more likely to sustain a second event.  Additionally, the Defendants have known (or should have known) for decades that even a single sub-concussive or concussive blow may cause brain injury, and the injured person often requires substantial time to recover.

41.     The Defendants have known (or should have known) for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on boxers and former football players, including former NCAA players, have established that both boxers and football players who sustain repetitive head impacts are exposed to an elevated risk of developing any one or more of the following conditions: early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, decline in attention and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as CTE.  The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above.  CTE is also associated with an increased risk of suicide.

42.     Published peer-reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing football, including amateur football, are linked to significant risk for permanent brain injury.

Electronically Filed 01/22/2015 12:34 / MOTION / CV 14 834486 / Confirmation Nbr. 339394 / BATCH

43.     Steve Schmitz was subjected to repetitive concussive and sub-concussive impacts in practices and games for the profit and promotion of the Defendants, yet he was never aware of the short-term and long-term health risk associated with concussive and sub-concussive impacts, was never educated by the Defendants regarding the risk, and was never furnished with appropriate health and safety protocols that would monitor, manage, and mitigate the risks associated with concussive and sub-concussive impacts while he played amateur football at Notre Dame.

### The Purported Mission to Protect Student Athletes

44.     Formerly known as the Intercollegiate Athletic Association of the United States, the NCAA was formed in 1906 purportedly to protect college students from dangerous athletic practices.

45.     At the turn of the 20th Century, an alarming rate of deaths due to head injuries were occurring in college football.  President Theodore Roosevelt convened a group of Ivy League Presidents and coaches to discuss how the game could be made safer. As a result of several subsequent meetings of colleges, the Intercollegiate Athletic Association of the United States ,, formed (IAAUS).  In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

46.     The NCAA's founding purpose to protect student-athletes has been repeated often, and as far back as 1909 at the annual convention of member institutions.  There, Chancellor James Roscoe Day of Syracuse University stated:

> The lives of the students must not be sacrificed to a sport. Athletic sports must be selected with strict regard to the safety of those practicing them. It must be remembered that the sport is not the end. It is incidental to another end far more important. We lose sight of both the purpose and the proportion when we sacrifice the student to the sport.

-10-

47.     Thus, since its inception, Defendant NCAA has held itself out as the supervisory force over conduct at intercollegiate events and practices throughout the country and shouldered a legal duty to protect student-athletes, including Steve Schmitz.

48.     According to its website, Defendant NCAA was founded "*to protect young people from the dangerous and exploitive athletic practices of the time.*" This core purpose is emphasized on the NCAA's website:

> Part of the NCAA's core mission is to provide student-athletes with a competitive environment that is safe and ensures fair play. While each school is responsible for the welfare of its student-athletes, the NCAA provides leadership by establishing safety guidelines, playing rules, equipment standards, drug testing procedures and research into the cause of injuries to assist decision making. By taking proactive steps to student -athletes' health and safety, we can help them enjoy a vibrant and fulfilling career.

49.     The NCAA's purported commitment to safeguarding its student-athletes is expressed throughout the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes. The NCAA Constitution states in pertinent part:

> The purposes of this Association are:
>
> (a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes;
> (b) To uphold the principal of *institutional control* of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association; . . .

NCAA Const., Art. 1, § 1.2(a)(b).

50.     The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

Electronically Filed 01/22/2015 12:34 / MOTION / CV 14 834486 / Confirmation Nbr. 339394 / BATCH

51.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of

Student-Athlete Well-Being," and provides in pertinent part:

> **2.2. The Principle of Student-Athlete Well-Being**
> Intercollegiate athletics programs shall be conducted in a manner designed to
> protect and enhance the physical and educational well-being of student
> athletes. (Revised: 11/21/05.)
>
> 2.2.3 **Health and Safety.** It is the responsibility of each member
> institution to protect the health of, and provide a safe environment for,
> each of its participating student athletes. (Adopted: 1/10/95.)

52.     The NCAA Constitution also mandates that "each member institution must

establish and maintain an environment in which a student-athlete's activities are conducted as an

integral part of the student-athlete's educational experience."  NCAA Const., Art. 2, § 2.2.1

(Adopted: 1/10/95).

53.     To accomplish this purported purpose, Defendant NCAA promulgates and

implements standard sport regulations and requirements, such as the NCAA Constitution,

Operating Bylaws, and Administrative Bylaws.  These NCAA documents provide detailed

instructions on game and practice rules, player eligibility, scholarships, and player well-being

and safety.  NCAA member institutions are required to abide by the NCAA rules and

requirements.

54.     The NCAA publishes a health and safety guide termed the Sports Medicine

Handbook (the "Handbook").  The Handbook, which is produced annually, includes the NCAA's

official policies and guidelines for the treatment and prevention of sports-related injuries, as

well as return-to-play guidance, and recognizes that "student-athletes rightfully assume that

those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the

risk of injury from athletics participation."

55.     To aid member institutions with the tools that they need to comply with NCAA

legislation, the NCAA Constitution promises that the "…Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations...."

56.     The NCAA, therefore, holds itself out as both a proponent of and authority on the treatment and prevention of sports-related injuries upon which student-athletes and member institutions can rely upon for guidance on player-safety issues. The NCAA has expressly and implicitly assumed a duty of care to the student-athletes it promised to protect.

57.     As a member institution, Notre Dame was charged with implementing and enforcing those guidelines in a meaningful way to protect the health and safety of Notre Dame football players, including Steve Schmitz.

58.     The NCAA, however, long ago shirked its legal duty, as did Notre Dame, which actively compelled and promoted its players to inflict head injuries on opponents and, therefore, themselves. For that and many other reasons set forth in this Complaint, the NCAA and its member institutions, particularly Notre Dame, have lost sight of the founding principles. Steve Schmitz's neuro-cognitive health has been sacrificed as part of the process, exclusively for the business of college football and the millions of dollars in profit the NCAA and Notre Dame reap every year from the Notre Dame football program.

### Notre Dame Football Fostered and Aggravated Head Injuries

59.     For more than 40 years, coaches around the country have known that a football player should not lead with his helmeted head. In 1967 the American Medical Association Committee on Medical Aspects of Sports declared that coaches should not teach players to lead with their head. By 1976, the NCAA and the National Federation of State High School Associations passed a safety rule prohibiting initial contact with the head.

60.     Despite this elementary rule, the Notre Dame coaching staff (a) did nothing to

-13-

protect the neuro-cognitive health of Steve Schmitz, and (b) never at any time discouraged players from leading with their helmets when tackling and blocking.

61.     On information and belief, the Notre Dame coaching staff accepted, praised, and rewarded tackling and blocking techniques that involved the use of the helmeted head against opposing players and teammates.

62.     As a result, it was a common method during Notre Dame football games and practices for players to use their helmeted heads when tackling and blocking, to inflict on each other and opponents helmet to helmet hits of all kinds, including concussive and sub-concussive head injuries for which they were never monitored or treated. This practice by the Notre Dame football coaches, and the Notre Dame football program aggravated the risk to Steve Schmitz and other Notre Dame football players for the following reasons:

> (a) the Notre Dame players were taught and/or encouraged and/or not discouraged to play the game by using their helmeted heads as a weapon and/or implement that would injure opponents and themselves; and
>
> (b) the Notre Dame football players were taught and required to continue to play in games and practices after they had sustained concussion symptoms, which were never recognized, addressed, or treated.

63.     If, for example, during practices or games a player on impact had their "bell rung" and/or was temporarily unaware of his surroundings, this meant nothing to the Notre Dame coaching staff. Players were ordered and expected to continue to participate in the practice or game. If a player failed to continue to participate or otherwise failed to abide by the coaches' instructions, the player risked his place on the Notre Dame football team, his scholarship, and his contractual right to attend classes at Notre Dame.

-14-

64.     For four years, Steve Schmitz participated in full contact tackling drills, practices, scrimmages, and games at Notre Dame.  On many occasions in drills, practices, and games, he experienced concussion symptoms, including but not limited to being substantially disoriented as to time and place.

65.     At no time, however, were the symptoms that Steve Schmitz demonstrated recognized either by him or the Notre Dame coaching staff as an injury that should be monitored, treated, or even acknowledged.

66.     At no time while Steve Schmitz played football at Notre Dame did a Notre Dame football coach or trainer advise or send Steve Schmitz to see a neurologist to test for concussion symptoms or neuro-cognitive health.

67.     At no time while Steve Schmitz played football at Notre Dame did anyone (a) test or examine Steve Schmitz for concussion symptoms; (b) advise or educate Steve Schmitz about what a concussion is; or (c) advise or educate Steve Schmitz about what concussion symptoms are.

68.     At no time while Steve Schmitz played football at Notre Dame did either he or any football program staff recognize that Steve Schmitz sustained an injury to the head that required treatment, rest or therapy.

**The Defendants Knew or Should Have Known of the Risks to Steve Schmitz**

69.     Both before and after Steve Schmitz played football at Notre Dame, the NCAA and Notre Dame knew or should have known of the mounting literature and medical advice regarding the latent effects of concussive and sub-concussive impacts and the need for disclosure to Notre Dame football players, pre-season baseline neuro-psychological testing, and safe return to play guidelines.

-15-

70.     Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science has long recognized the debilitating effects of concussions, and found that that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

71.     In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland study").  The article was published in the *Journal of the American Medical Association*.  The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

72.     In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

73.     In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers.  After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that the boxer suffered significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

-16-

74. The recommendations were codified as rules of the New York State Athletic Commission.

75. In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in professional boxers.

76. That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.,* recommending that players cease to play football permanently after receiving their third concussion.)

77. In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

78. A 1963 study by Drs. Mawdsley & Ferguson published in *Lancet* found that some boxers sustain chronic neurological damages as a result of repeated head injuries. This damage manifested in the form of dementia and impairment of motor function.

79. A 1967 study Drs. Hughes & Hendrix examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.

80. Also in 1967 the American Medical Association Committee on Medical Aspects of Sports declared that coaches should not teach players to lead with their head.

81. In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries, recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

-17-

82.     In 1973, Drs. Corsellis, Bruton, & Freeman-Browne studied the physical neurological impact of boxing.  This study outlined the neuropathological characteristics of "Dementia Pugilistica," including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

83.     A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion.  The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

84.     By 1975, the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey led to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

85.     In 1973, a potentially fatal condition known as "Second Impact Syndrome"—in which re-injury to the already-concussed brain triggers swelling that the skull cannot accommodate—was identified.  It did not receive this name until 1984.  Upon information and belief, Second Impact Syndrome has resulted in the deaths of at least forty football players.

86.     By 1976, the NCAA and the National Federation of State High School Associations passed a safety rule prohibiting initial contact with the head.  On information and belief, neither the NCAA nor the Notre Dame football coaches and athletic department ever implemented or enforced this rule both during or after Steve Schmitz played college football.

87.     Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple

-18-

concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

> repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

> encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;

> acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

> with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

> immediate retrograde memory issues occur following concussions;

> mild head injury requires recovery time without risk of subjection to further injury;

> head trauma is linked to dementia;

> a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

> minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

88.     In the early 1980s, the Department of Neurosurgery at the University of Virginia, an NCAA member institution, published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment. The studies were published in neurological journals and treatises within the United States and received national attention.

89.     In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage. With respect to concussions, the same studies

-19-

showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

90.     The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

91.     In 1986, Dr. Robert Cantu of the American College of Sports Medicine published *Concussion Grading Guidelines*, which he later updated in 2001.

92.     By 1991, three distinct medical professionals/entities, all independent from the NCAA—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

93.     In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players.  The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

94.     In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research.  These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

Electronically Filed 01/22/2015 12:34 / MOTION / CV 14 834486 / Confirmation Nbr. 339394 / BATCH

95.     This echoed similar medical protocol established at a Vienna conference in 2001. These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

96.     The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in professional football players and the number of concussions those players had received.

97.     A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

98.     Although the Defendants knew for decades of the harmful effects of concussive and sub-concussive events on student-athletes, they ignored these facts and failed to institute any meaningful method of warning and/or protecting the student-athletes, including the football players, most likely because the revenue from football was so great, and the business of college football so profitable.

99.     On information and belief, during every decade referenced above, the Defendants NCAA and Notre Dame (including but not limited to its football program) had access to the foregoing information.

100.    Information collected by the NCAA's own injury surveillance data confirmed that high rates of concussions and head injuries, with concussions accounting for 7% of all football practice and game injuries and between 7% and 14% of all hockey injuries in the 2005-2006 season.

-21-

101.    In 2003, two separate studies partially funded by the NCAA concluded the following: (1) that athletes required a full seven days to regain their pre-concussion abilities after sustaining a concussion; and (2) that NCAA football players with a history of concussions were at an increased risk of sustaining additional future concussions, and thus, should receive more information about this risk before deciding whether to continue playing football. One of the studies further recommended the use of standardized assessment tools to guide medical staff in evaluating and treating student athletes.

### The NCAA and Notre Dame Ignored Mounting Medical Evidence and Refused to Implement Any of the Recommended Guidelines

102.    Despite the foregoing research studies and expert recommendations, the NCAA ignored the fact that member institutions encouraged and actually required players to play in the very same game or practice in which the player sustained a concussion or a likely concussion.

103.    Despite the foregoing research studies and expert recommendations, Defendants NCAA and Notre Dame failed to implement any guidelines or rules to prevent repeated concussions and failed to educate players about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football.

104.    Despite the forgoing research, neither the NCAA nor Notre Dame recommended return to play procedures or took any action to educate student athletes subject to its rules on the risks of repeated head trauma.

105.    Despite the foregoing research studies and expert recommendations, Notre Dame conducted a football program that proactively rewarded Steve Schmitz for inflicting head injuries on himself and others and compelled him to ignore concussion symptoms and

-22-

continue to play football within moments of sustaining concussion symptoms. Specifically, the Notre Dame coaches demanded that Notre Dame football players, including Steve Schmitz, sustain head injuries and inflict head injuries on other players for the purpose of advancing the Notre Dame football program by winning games, obtaining fame and favorable publicity, and gaining millions of dollars in revenue for Notre Dame.

106.    Despite the foregoing research studies and expert recommendations, neither the NCAA nor Notre Dame ever contacted Steve Schmitz after he had graduated from Notre Dame to inform him that he had been exposed to an increased risk of long-term brain damage by the concussive and sub-concussive blows sustained while playing football for Notre Dame.

107.    Later, after Steve Schmitz had left Notre Dame, neither Notre Dame nor the NCAA accepted or adopted any of the internationally accepted guidelines regarding concussion management and return to play protocols, thereby endorsing and allowing the ongoing practices of its member institutions, including Defendant Notre Dame. Rather, the NCAA rejected the international recommendations and continued to promote individualized approaches, such as the active encouragement by Notre Dame football that its student-athletes inflict head injuries on themselves and others during games and practices for the sole purpose of winning games, obtaining fame, and making money for Notre Dame.

108.    On information and belief, Notre Dame continued to conduct its football program in the exact same way from 1979 through 2010 and, like the NCAA, ignored all medical evidence that required Notre Dame to fulfill its obligation to protect the neurological health of students who participated in the football program.

-23-

109.    It was not until April 2010 that the NCAA made changes to its concussion treatment protocols, this time passing legislation that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

110.    Under that new policy, schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

111.    The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and that medical clearance would be determined by the team physician.

112.    Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

113.    The policy was too late for Steve Schmitz.

114.    Moreover, Defendant NCAA passed the responsibility for developing prevention and management procedures on to its member schools, such as the Defendant Notre Dame, and placed the burden of actively seeking medical attention on student-athletes, most of whom are less than 22 years old and are beholden to coaches for both a place on the team roster and the right to attend the school.

## COUNT I - NEGLIGENCE
### (Plaintiff STEVE SCHMITZ Against the NCAA and NOTRE DAME)

115.    Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 114 set forth above.

-24-

116.     From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations.  That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players.

117.     Defendant Notre Dame also assumed similar duties to all its student athletes, including Steve Schmitz.

118.     The duties of both Defendants included an obligation to supervise, regulate, and monitor the rules of the Notre Dame football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to Notre Dame football players.

119.     Defendant NCAA had an additional duty to educate Notre Dame and Notre Dame football players on the proper ways to evaluate and treat concussive events during football games and practices, including repetitive sub-concussive and concussive impacts.  The NCAA's duty further included a duty to warn student athletes of the dangers of sub-concussive and concussive injuries and of the risks associated with football before, during, and after they played college football and as additional information came to light.

120.     Both Defendants had a duty not to conceal material information from Notre Dame football players, including Steve Schmitz.

121.     The Defendants jointly breached their duties to Steve Schmitz by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and

-25-

treatment of concussive and sub-concussive impacts on the playing field, in locker rooms, and in the weeks and months after a Notre Dame football player sustained an concussive and sub-concussive impacts, and the providing treatment for the latent effects of concussive and sub-concussive impacts. This failure includes, but is not limited to:

(a)     failing to recognize and monitor concussive and sub-concussive injury during football practices and games;

(b)     failing inform the student football players of the dangers of concussive and sub-concussive injuries;

(c)     failing to implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or is suspected of sustaining such injuries;

(d)     failing to implement procedures to monitor the health of student football players who have sustained (or are suspected of sustaining) concussive and/or sub-concussive injuries;

(e)     failing to inform the student football players' extended families of concussive and/or sub-concussive injuries the student football players had sustained; and

(f)     failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time Steve Schmitz graduated from Notre Dame.

122.    Both Defendants breached their duties to Steve Schmitz by fraudulently concealing and/or failing to disclose and/or failing to recognize and /or being willfully blind to: (a) material

information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to student football players.

123.    Notre Dame, in particular, breached its duty to Steve Schmitz by actively teaching and encouraging Notre Dame football players to inflict concussions on themselves and others as an effective way to play football.

124.    Steve Schmitz relied upon the guidance, expertise, and instruction of both Defendants regarding the serious and life-altering medical issue of concussive and sub-concussive risk in football.

125.    At all times, the Defendants had superior knowledge of material information regarding the effect of repeated concussive events. Because such information was not readily available to Steve Schmitz, the Defendants knew or should have known that Steve Schmitz would act and rely upon the guidance, expertise, and instruction of the Defendants on this crucial medical issue, while at Notre Dame and thereafter.

126.    Repetitive concussive and sub-concussive impacts during college football practices and games has a pathological and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as Tau protein, which is a signature pathology of CTE, the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

127. Plaintiff Steve Schmitz experienced repetitive sub-concussive and concussive brain impacts during his college football career. These impacts significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

128. The repetitive head accelerations and hits to which Steve Schmitz was exposed presented risks of latent and long-term debilitating chronic illnesses. Absent the defendant's negligence and concealment, the risks of harm to Steve Schmitz would have been materially lower, and Steve Schmitz would not have sustained the brain damage from which he currently suffers.

129. The repetitive concussive and sub-concussive impacts Steve Schmitz sustained while playing football at Notre Dame resulted in neuro-cognitive and neuro-behavioral changes over time in Steve Schmitz. Now, at age 58, Steve Schmitz is permanently disabled based on the latent effects of neuro-cognitive and neuro-behavioral injuries he sustained while playing football at Notre Dame. The latent injuries sustained by Steve Schmitz developed over time and were manifest later in life. They include, but are not limited to, varying forms of neuro-cognitive disability, decline, personality change, forgetfulness, early onset Alzheimer's Disease, and CTE, all of which will require future medical care. At no time prior to being diagnosed in December 2012 was Steve Schmitz aware that he had sustained a brain injury as a result of football.

130. As a direct and proximate result of the NCAA's and Notre Dame's negligence, Steve Schmitz has incurred damages in the form of permanent brain damage, emotional distress, past and future medical, health care, and home care expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Steve Schmitz will likely incur future damages caused by the NCAA's and Notre Dame's negligence.

-28-

131.    As a result of their misconduct, the Defendants NCAA and Notre Dame are liable to Plaintiff Steve Schmitz for the full measure of damages allowed under applicable law.

## COUNT II – FRAUD BY CONCEALMENT / FRAUDULENT CONCEALMENT
### (Plaintiff STEVE SCHMITZ Against the NCAA and NOTRE DAME)

132.    Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 131 set forth above.

133.    Defendant NCAA and its member institutions, including Defendant Notre Dame, had a duty to protect their student athletes, which included, among other things, the duty to warn, disclose and/or otherwise speak to these student athletes, including Plaintiff Steve Schmitz, about the risk of harm and long-term health effects of repetitive concussive and sub-concussive impacts in playing football.

134.    As early as 1933, and certainly between the early 1970s and the 1990s, which includes the time period within which Steve Schmitz played football at Defendant Notre Dame, the NCAA and Notre Dame knew that repetitive head impacts in football games and full-contact practices created a substantial risk of harm to student-athletes that was similar or identical to the risk of harm to boxers who receive repetitive impacts to the head during boxing practices and matches, and professional football players, many of whom were forced to retire from professional football because of head injuries.

135.    The Defendants were aware of and understood the significance of the published medical literature described in the preceding paragraphs of this Complaint, which detailed the serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which Notre Dame football players are exposed.

136.    Despite such knowledge and awareness, Defendants NCAA and Notre Dame concealed these risks from their football players, including Plaintiff Steve Schmitz, with the

-29-

intent of misleading their football players, including Plaintiff Steve Schmitz, into believing he was safe and that he would not suffer any long-term debilitating cognitive injuries from playing football.

137.    Defendants NCAA and Notre Dame were willfully blind to and/or knowingly and intentionally concealed from NCAA football players generally, and Notre Dame football players specifically, the risks of concussive and sub-concussive impacts in NCAA games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive impact  Concealing and otherwise failing to disclose these risks to their football players, including Plaintiff Steve Schmitz, had the same force and effect of Defendants NCAA and Notre Dame misrepresenting facts to their football players, including Plaintiff Steve Schmitz.

138.    Given the NCAA's and Notre Dame's superior and unique vantage point, Steve Schmitz reasonably looked to, and otherwise relied upon, the NCAA and Notre Dame for guidance on health and safety issues, such as disclosing to him and providing him with information, precautionary measures, and warnings about concussions, including the later-in-life consequences of the repetitive head impacts he sustained while a football player at Notre Dame.

139.    As a direct and proximate result of Plaintiff Steve Schmitz's reliance upon Defendants NCAA and Notre Dame, Plaintiff Steve Schmitz has suffered and will continue to suffer substantial injuries, harm, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

140.    As a direct and proximate result of the NCAA's and Notre Dame's knowing concealment and/or willful blindness, Plaintiff Steve Schmitz has suffered and will continue to

Electronically Filed 01/22/2015 12:34 / MOTION / CV 14 834486 / Confirmation Nbr. 339394 / BATCH

suffer substantial injuries, harm, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

141. As a result of the NCAA's and Notre Dame's misconduct, including the concealment of facts known to them, which they had a duty to disclose to their football players, including Plaintiff Steve Schmitz, the NCAA and Notre Dame are liable to Plaintiff Steve Schmitz for the full measure of damages allowed under applicable law.

**COUNT III – CONSTRUCTIVE FRAUD**
**(Plaintiff STEVE SCHMITZ vs. NCAA and NOTRE DAME)**

142. Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 141 set forth above.

143. Defendant NCAA and its member institutions, including Defendant Notre Dame, had a duty to protect their student athletes, which included, among other things, the duty to warn, disclose and/or otherwise speak to these student athletes, including Plaintiff Steve Schmitz, about the risk of harm and long-term health effects of repetitive head injuries while playing football.

144. This duty arose by virtue of the contractual relationships set forth in the Counts below and the aforementioned reasons, as well the unique nature of the relationship between both Steve Schmitz and the University of Notre Dame, for whom he played college football, and Steve Schmitz and the NCAA, which, among other things, regulated Steve Schmitz' participation in the sport. As a result of these relationships, the NCAA and Notre Dame were in a position to take unfair advantage of Plaintiff Steve Schmitz.

145. As early as 1933, and certainly between the early 1970s and the 1990s, which includes the time period within which Steve Schmitz played football at Defendant Notre Dame, the NCAA and Notre Dame knew that repetitive head impacts in football games and full-contact practices created a substantial risk of harm to student-athletes that was similar or identical to the

-31-

risk of harm to boxers who receive repetitive impacts to the head during boxing practices and matches, and professional football players, many of whom were forced to retire from professional football because of head injuries.

146. The Defendants were aware of and understood the significance of the published medical literature described in the preceding paragraphs of this Complaint, which detailed the serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which Notre Dame football players are exposed.

147. Despite such knowledge and awareness, Defendants NCAA and Notre Dame concealed and/or otherwise withheld information regarding these risks from their football players, including Plaintiff Steve Schmitz, leading Plaintiff Steve Schmitz to believe he was safe and that he would not suffer any long-term debilitating cognitive injuries from playing football.

148. Defendants NCAA and Notre Dame concealed and/or otherwise withheld from NCAA football players generally, and Notre Dame football players specifically, the risks of concussive and sub-concussive impacts in NCAA games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive event. Concealing and otherwise failing to disclose these risks to their football players, including Plaintiff Steve Schmitz, had the same force and effect of Defendants NCAA and Notre Dame misrepresenting facts to their football players, including Plaintiff Steve Schmitz.

149. Given the NCAA's and Notre Dame's superior and unique vantage point, Steve Schmitz reasonably looked to, and otherwise relied upon, the NCAA and Notre Dame for guidance on health and safety issues, such as disclosing to him and providing him with information, precautionary measures warnings about head injuries and concussions, including the

-32-

later-in-life consequences of the repetitive head impacts he sustained while a football player at Notre Dame.

150.    As a direct and proximate result of Plaintiff Steve Schmitz's reliance upon Defendants NCAA and Notre Dame, Plaintiff Steve Schmitz has suffered and will continue to suffer substantial injuries, harm, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

151.    As a direct and proximate result of the NCAA's and Notre Dame's concealment and/or withholding facts and information, Plaintiff Steve Schmitz has suffered and will continue to suffer substantial injuries, harm, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

152.    At the same time, Notre Dame and the NCAA gained the unfair advantage of having their football players, including Steve Schmitz, continue to play football for them, resulting in profits, prestige and pecuniary gains to Notre Dame and the NCAA at the expense of Steve Schmitz and his long-term health.

153.    As a result of the NCAA's and Notre Dame's misconduct, including the concealment of facts known to them, which they had a duty to disclose to their football players, including Plaintiff Steve Schmitz, the NCAA and Notre Dame are liable to Plaintiff Steve Schmitz for the full measure of damages allowed under applicable law.

## COUNT IV- BREACH OF EXPRESS CONTRACT
### (Plaintiff STEVE SCHMITZ vs. NCAA)

154.    Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 153 as set forth above.

-33-

155.     As a student-athlete at Defendant Notre Dame, an NCAA-governed institution, Plaintiff Steve Schmitz was required to enter into a contract with Defendant NCAA as a prerequisite to sports participation.  The contract required Plaintiff Steve Schmitz to sign a form affirming that he has read the NCAA regulations and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and further, that he agreed to abide by NCAA Division bylaws.

156.     In exchange for Steve Schmitz's agreement, the NCAA promised to perform certain services and functions, including, inter alia:

> (a) conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational well-being of student-athletes (NCAA Const., Art. 2, § 2.2);

> (b) requiring that Notre Dame protect Steve Schmitz' health and provide a safe environment for all of its participating student-athletes, including Steve Schmitz (NCAA Const., Art. 2, § 2.2.3); and

> (c) requiring that each member institution, including Notre Dame, establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience (NCAA Const., Art. 2, § 2.2).

157.     By signing and agreeing to abide by NCAA regulations, and thereafter participating in NCAA sanctioned football program, Steve Schmitz fulfilled his obligations under the contract.

158.     In addition, Steve Schmitz is a third party beneficiary of the contract between the NCAA and Notre Dame, and Notre Dame adopted the same duties to Steve Schmitz to

-34-

which the NCAA had agreed.

159.     The NCAA breached its obligations under its contract with Steve Schmitz by failing to ensure a safe environment at Notre Dame football practices and games in which Steve Schmitz participated. The NCAA further breached its obligation by concealing and/or failing to properly educate and warn Steve Schmitz about the symptoms and long-term risks of concussions and concussion-related concussive and sub-concussive impacts.

160.     Furthermore, the NCAA breached its contractual duty to Steve Schmitz by failing to offer mid and late life warnings and treatment to mitigate the latent brain injuries he sustained and would sustain.

161.     The NCAA's breach of its contractual obligations caused Plaintiff Steve Schmitz to suffer physical injury and damages in the form of latent brain damage, emotional distress, loss of income and employment, and past, ongoing, and future medical expenses.

162.     Plaintiff Steve Schmitz seeks actual damages for the NCAA's breach of contract, as well as interest, reasonable attorney's fees, expenses, and costs to the extent allowable.

163.     Plaintiffs have not attached a copy of the contract as required by Ohio Civil Rule 10(D) because he has not been able to locate it.  After moving a number of times and, more recently, losing his home, Plaintiff has not been able to locate all of his belongings. Plaintiffs believe Defendants NCAA and/or Notre Dame likely possess copies of the contract.

### COUNT V - BREACH OF IMPLIED CONTRACT
### (Plaintiff STEVE SCHMITZ vs. NCAA)

164.     Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 163 as set forth above.

-35-

165.    Under an implied contract, all student-athletes agree to be bound by NCAA rules and regulations in exchange for their participation in NCAA-controlled athletic programs.

166.    As a condition of the implied contract, the NCAA agreed to abide by the promises set forth in its own Constitution and Bylaws, as described above.

167.    Plaintiff Steve Schmitz showed his acceptance of the contract and performed under the contract by participating in NCAA-controlled athletic programs at Notre Dame in accordance with NCAA rules and regulations.

168.    Defendant NCAA breached the contract by failing to ensure that Steve Schmitz was provided with a safe environment in which to participate in Notre Dame football.

169.    Defendant NCAA further breached the contract by concealing and/or failing to properly educate and warn Steve Schmitz and other players about the symptoms and long-term risks of concussions and sub-concussive events-.  Furthermore, the NCAA breached its duty to Steve Schmitz by failing to offer mid and late life warnings and treatment to mitigate his injuries.

170.    Defendant's breach of the contract caused Steve Schmitz to suffer long-term physical injury and damages in the form of latent brain damage, loss of employment, loss of income, past, ongoing, and future medical expenses, other out of pocket expenses, lost time, lost future earnings, and other damages.  Plaintiff Steve Schmitz will likely incur future damages caused by Defendant's breach.

171.    Plaintiff Steve Schmitz seeks damages for Defendant's breach of contract, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

Electronically Filed 01/22/2015 12:34 / MOTION / CV 14 834486 / Confirmation Nbr. 339394 / BATCH

## COUNT VI- BREACH OF EXPRESS CONTRACT
### (Plaintiff STEVE SCHMITZ vs. NOTRE DAME)

172.    Plaintiff Steve Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 171 as set forth above.

173.    As a Cleveland, Ohio high school student recruited by Notre Dame, Plaintiff Steve Schmitz entered into a written agreement in which he committed to play football at Notre Dame, to attend Notre Dame as a student, and to comply with all codes of conduct and obligations as both a football player and student at Notre Dame.

174.    The contract required that Notre Dame fulfill its obligations to Steve Schmitz, and those obligations included that:

>    (a) Notre Dame conduct the Notre Dame football program in a manner designed to protect and enhance the physical and educational well-being of Steve Schmitz and other student football players; and

>    (b) require that the Notre Dame football program furnish a safe environment for Steve Schmitz and all of the program's participants.

175.    Steve Schmitz fulfilled his obligations under the contract.

176.    In addition, Steve Schmitz is a third party beneficiary of the contract between the NCAA and Notre Dame, and Notre Dame adopted the NCAA's duties to Steve Schmitz set forth above.

177.    Notre Dame breached its obligations under the contract by failing to ensure a safe environment at Notre Dame football in which Steve Schmitz participated.

178.    Notre Dame further breached its obligation by concealing and/or failing to properly educate and warn Steve Schmitz about the fact that he was being exposed to long-term health risks that would destroy his life..

Electronically Filed 01/22/2015 12:34 / MOTION / CV 14 834486 / Confirmation Nbr. 339394 / BATCH

179.    Notre Dame further breached its obligation by supporting, sponsoring, and encouraging a Notre Dame football program that demanded and urged Steve Schmitz and other student football players to inflict concussive and sub-concussive impacts on themselves and others in practices and games.

180.    Furthermore, Notre Dame breached its contractual duty to Steve Schmitz by failing to offer mid and late life warnings to help him become aware of and mitigate his latent brain injuries.

181.    Notre Dame's breach of its contractual obligation caused Plaintiff Steve Schmitz to suffer physical injury and damages in the form of latent brain damage, emotional distress, loss of income and employment, and past, ongoing, and future medical expenses.

182.    Steve Schmitz seeks actual damages for Notre Dame's breach of contract, as well as interest, reasonable attorney's fees, expenses, and costs to the extent allowable.

183.    Plaintiff has not attached a copy of the contract as required by Ohio Civil Rule 10(D) because he has not been able to locate it. After moving a number of times and, more recently, losing his home, Plaintiff has not been able to locate all of his belongings.  Plaintiffs believe, however, that Defendant Notre Dame likely possesses a copy of the contract.

## COUNT VII
## LOSS OF CONSORTIUM
### (Plaintiff YVETTE SCHMITZ Against the NCAA AND NOTRE DAME)

184.    Plaintiff Yvette Schmitz incorporates by reference as if fully set forth herein paragraphs 1 through 183 above.

185.    As a result of their misconduct, the Defendants are liable to Plaintiff Yvette Schmitz.

-38-

186.    As a direct and proximate result of the intentional misconduct, carelessness, negligence, and recklessness, Plaintiff Steve Schmitz has sustained the injuries as set forth above and will continue to incur injuries and damages as his life progresses.

187.    As a result, Plaintiff Yvette Schmitz has been damaged as follows:

      a.    She has been and will continue to be deprived of the services, society and companionship of her husband;

      b.    She has been and will continue to be required to spend money for medical care and household care for the treatment of her husband; and

      c.    She has been and will continue to be deprived of the earnings of her husband, but for the injuries he has sustained as a result of the conduct of the Defendants.

188.    As a result of Notre Dame's and the NCAA's misconduct and the injuries sustained by Plaintiff Steve Schmitz, Plaintiff Yvette Schmitz is entitled to damages, as alleged herein and allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs Steve and Yvette Schmitz pray for judgment as follows:

      A.    With respect to all Counts, an award of compensatory damages against the NCAA and Notre Dame in excess of $25,000, exclusive of costs.

      B.    With respect to all Counts, an award to Plaintiffs Steve and Yvette Schmitz of punitive damages;

Electronically Filed 01/22/2015 12:34 / MOTION / CV 14 834486 / Confirmation Nbr. 339394 / BATCH

C.      With respect to all Counts, an award to Plaintiffs Steve and Yvette Schmitz of such other and further relief as may be appropriate; and

D.      With respect to all Counts an award to Plaintiffs Steve and Yvette Schmitz of prejudgment interest, costs and attorney's fees.

### JURY DEMAND

Pursuant to Rule 38 (B) of the Ohio Rules of Civil Procedure, plaintiffs hereby demand a trial by jury in this action.

Respectfully Submitted,

**BARKAN MEIZLISH HANDELMAN GOODIN DEROSE WENTZ, LLP**

*/s/ Robert E. DeRose*
Robert E. DeRose (OH Bar No. 0055214)
Neal J. Barkan (OH Bar No. 000020450)
250 E. Broad St., 10th Floor
Columbus, Ohio 43215
Phone: 614-221-4221
Facsimile No.: 614-744-2300
Email: bderose@barkanmeizlish.com
      nbarkan@barkanmeizlish.com

And

David D. Langfitt (Pro Hac Vice Anticipated)
Melanie J. Garner (Pro Hac Vice Anticipated)
**LOCKS LAW FIRM**
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 893-3423
Fax: (215) 893-3444
Email: dlangfitt@lockslaw.com
      mgarner@lockslaw.com
And

Richard S. Lewis (Pro Hac Vice Anticipated)
**HAUSFELD LLP**

-40-

1700 K Street, N.W.
NW Suite 650
Washington, DC 20006
Ph: 202-540-7151
Fax: 202.540.7201
Email: rlewis@hausfeldllp.com

**ATTORNEYS FOR PLAINTIFFS STEVEN AND YVETTE SCHMITZ**

-41-

IN THE COURT OF COMMON PLEAS CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| STEVEN SCHMITZ and<br>YVETTE SCHMITZ, | : | |
| | : | |
| Plaintiffs, | : | Case No. CV 14 834436 |
| | : | |
| v. | : | Hon. Deena R. Calabrese |
| | : | Magistrate Judge Monica Klein |
| | : | |
| NATIONAL COLLEGIATE ATHLETIC | : | Order Granting |
| ASSOCIATION, AND | : | Plaintiffs' Motion for Leave to |
| UNIVERSITY OF NOTRE DAME, | : | File Amended Complaint |
| | : | Pursuant to Rule 15(A) |
| Defendants. | : | |
| | : | |

## ORDER

This Court, having considered the Motion for Leave to File Amended an Complaint and

Memorandum in Support thereof, including the proposed Amended Complaint submitted

together with the Motion, and any opposition thereto, finds that leave should be given in the

interest of justice.

It is therefore ORDERED that:

1.    Plaintiffs' Motion for Leave to File an Amended Complaint Pursuant to Rule

15(A) is hereby GRANTED;

2.    Plaintiffs are to serve the Amended Complaint via electronic filing within seven

(7) days of the date of this Order; and

3.    Defendants National Collegiate Athletic Association and University of Notre

Dame shall accept service of Plaintiffs' Amended Complaint via electronic filing.

4.    Defendants National Collegiate Athletic Association and University of Notre

Dame shall file a responsive pleading within the time allowed under the Ohio Rules.

Dated:_____          _____

                                       HON. DEENA R. CALABRESE